IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| UNITED STATES OF AMERICA, Plaintiff, v. RONALD B. TALMAGE, et al., Defendants. | **MEMORANDUM DECISION AND ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT** <br><br> Case No. 1:16-cv-00019-DN <br><br> District Judge David Nuffer |
|---|---|

Defendants Western Land & Livestock LLC ("Western Land") and Western Reserve Mortgage LLC (collectively, the "Western Entities") filed a motion for summary judgment ("Motion 1")[1] against Plaintiff United States of America to quiet title to the real property that is the subject of this lawsuit. Consideration of Motion 1 was deferred under Fed. R. Civ. P. 56(d) pending the completion of discovery.[2] After discovery ended, the Western Entities filed a "supplemental and renewed" motion for summary judgment ("Motion 2") on the same grounds as previously asserted in Motion 1.[3] Motion 2 expressly incorporates "by reference the 'Statement of Undisputed Facts' and all evidence in support thereof from"[4] a separately filed

---

[1] Motion for Summary Judgment to Dismiss the Government's Foreclosure Claim, docket no. 64, filed December 19, 2016 ("Motion 1"); *see* Notice of Errata re: Motion for Summary Judgment to Dismiss the Government's Foreclosure Claim, docket no. 66, filed December 20, 2016; United States' Response to Motion for Summary Judgment ("Response 1"), docket no. 77, filed January 13, 2017; United States' Response to Motion for Summary Judgment – Errata, docket no. 78, filed January 17, 2017; Reply Memorandum in Support [of] Motion for Summary Judgment, docket no. 83, filed January 31, 2017 ("Reply 1").

[2] *See* Memorandum Decision and Order Granting 56(d) Motion, docket no. 106, filed March 6, 2017.

[3] Supplemental and Renewed Motion for Summary Judgment re: Liberty Property, docket no. 200, filed November 30, 2018 ("Motion 2"); *see* United States' Response to the Western Parties' Supplemental and Renewed Motion for Summary Judgment re: Liberty Property ("Response 2"), docket no. 204, filed December 14, 2018; Reply Memorandum in Support of Supplemental and Renewed Motion for Summary Judgment re: Liberty Property ("Reply 2"), docket no. 208, filed December 28, 2018.

[4] Motion 2, *supra* note 3, at 9.

motion for partial summary judgment (the "MPSJ").[5] The MPSJ was later denied based on the existence of genuine issues of material fact.[6] The existence of genuine issues of material fact also require that Motion 1 and Motion 2 (collectively, the "Motions") be DENIED.[7]

## BACKGROUND

This action concerns a dispute between the Western Entities and the United States regarding the ownership of certain real property, referred to as the "Liberty Property," on which the United States seeks to foreclose to satisfy liens arising from the tax obligations of Defendants Ronald B. Talmage and Annette C. Talmage.[8] Although title to the Liberty Property is recorded in the name of Western Land,[9] the United States contends that this is a fraudulent transaction and

---

[5] Motion for Partial Summary Judgment re: Talmage Ponzi Scheme ("MPSJ"), docket no. 176, filed September 24, 2018. The United States' response to Motion 2 likewise incorporates by reference its response to the MPSJ. Response 2, *supra* note 3, at 14, 33.

[6] Memorandum Decision and Order Denying Motion for Partial Summary Judgment ("Order Denying MPSJ"), docket no. 241, filed April 25, 2019. The Order Denying MPSJ states: "[T]here is a genuine dispute regarding the nature and significance of transactions related to the Liberty Property. There is a genuine dispute regarding the nature and extent of the Western Entities' relationship, dealings, and involvement with the Talmages and affiliated entities. And there is a genuine dispute regarding the nature and source of the funds involved in these transactions and dealings." *Id.* at 3. Just as these disputed issues required the denial of the MPSJ—which is incorporated by reference in Motion 2—they also require the denial of the instant Motions.

[7] Apart from the merits of the parties' respective positions, the parties are hereby reminded of their obligation to comply with the Utah Standards of Professionalism and Civility, including particularly standards 1 and 4. UTAH CODE JUD. ADMIN. 14-301(1), (4); *see* DUCivR 83-1.1(g). In accordance with these standards, it is neither persuasive nor appropriate to, for example, lightly accuse opposing parties of being "disingenuous," of "intentionally playing dumb," or of actually being "dumb." *See, e.g.*, Reply 1, *supra* note 1, at 3; Reply 2, *supra* note 3, at 4.

[8] *See* Memorandum Decision and Order Denying Motion to Amend Complaint, at 1-2, docket no. 209, filed December 28, 2018. The Talmages failed to appear or defend themselves in this case, and a default judgment was entered against them on August 26, 2016, in the principal amount of $10,813,740.19. *See* Default Certificate, docket no. 25, filed July 18, 2016; Order Granting United States' Motion for Default Judgment Against Defendants Ronald B. Talmage and Annette C. Talmage, docket no. 38, filed August 26, 2016.

[9] *See* Complaint ¶¶ 85-86, docket no. 2, filed February 18, 2016; Counterclaim for Quiet Title ¶¶ 5-13, docket no. 49, filed October 28, 2016.

that the Talmages have beneficial interests in the property through a purchase-money resulting trust and constructive trust.[10]

Sometime in 2009 or 2010, Ronald Talmage introduced his then-friend John Wadsworth, the principal of the Western Entities, to the Liberty Property and encouraged him to purchase it.[11] On September 14, 2011, Wadsworth did so through Western Land for $575,000.[12] The funds for this purchase came, either in whole or in part, from entities under the Talmages' control.[13] At that time, the Talmages owed millions of dollars in taxes to the United States.[14]

While record title to the Liberty Property has never been in the Talmages' name, the Talmages resided on the property from 2010 through 2016.[15] During that time, they deliberately avoided having their names appear on any contracts associated with the property.[16] They paid $5,000/month in "rent" to Western Land—even though the market rate was approximately $2,220/month.[17] They made customized alterations and renovations to the property totaling $362,031—at least some of which were made without Western Land's permission.[18] And they caused $292,219 to be provided for the property's taxes and utilities.[19] Altogether, the Talmages

---

[10] *See* Complaint, *supra* note 9, ¶¶ 77-80, 85-89, 98-106.

[11] Response 1, *supra* note 1, at 19; Response 2, *supra* note 3, at 13-14, 19-20.

[12] Motion 1, *supra* note 1, at 5-6; Response 2, *supra* note 3, at 18.

[13] Order Denying MPSJ, *supra* note 6, at 2; Motion 1, *supra* note 1, at 5; Response 2, *supra* note 3, at 18-19.

[14] *See* Response 1, *supra* note 1, at 19; Response 2, *supra* note 3, at 13.

[15] Response 2, *supra* note 3, at 13.

[16] Response 1, *supra* note 1, at 20.

[17] Response 2, *supra* note 3, at 16.

[18] *Id.* at 14, 16-18; *see* Response 1, *supra* note 1, at 20.

[19] Response 1, *supra* note 1, at 20; Response 2, *supra* note 3, at 18.

caused $1,129,719 to be paid toward the Liberty Property on a net basis.[20] Wadsworth and the Western Entities, on the other hand, did not pay anything toward the property on a net basis.[21]

After vacating the Liberty Property, the Talmages absconded, and bench warrants for their arrest are presently outstanding.[22]

## DISCUSSION

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[23] A dispute is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[24] A fact is "material" if "it is essential to the proper disposition of [a] claim."[25] In ruling on a motion for summary judgment, the evidence and all reasonable inferences are viewed in the light most favorable to the nonmoving party.[26]

Section 6321 of the Internal Revenue Code provides that a lien arises "in favor of the United States upon all property and rights to property, whether real or personal, belonging to" "any person liable to pay any tax" who "neglects or refuses to pay the same after demand."[27] This "lien applies to property owned by the delinquent at any time during the life of the lien."[28]

---

[20] Response 2, *supra* note 3, at 18.

[21] *Id.* at 18-19.

[22] Bench Warrants, docket no. 191, filed November 6, 2018; *see* Report and Recommendation, docket no. 190, filed November 7, 2018.

[23] FED R. CIV. P. 56(a).

[24] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[25] *Id.*

[26] *Id.*

[27] 26 U.S.C. § 6321.

[28] *Glass City Bank v. United States*, 326 U.S. 265, 268 (1945).

4

"Unless another date is specifically fixed by law, the lien . . . arise[s] at the time the assessment is made and . . . continue[s] until the liability . . . is satisfied or becomes unenforceable by reason of lapse of time."[29] To determine whether the tax lien attaches to specific property, courts engage in a two-step process.[30] First, they "look to state law to determine what rights the taxpayer has in the property."[31] And, second, they look "to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation."[32]

The Western Entities seek summary judgment based solely on the first step of this analysis. Specifically, they argue that "the Government cannot prove . . . that the Talmages have a state-law property interest in the Liberty Property [under purchase-money resulting trust and constructive trust theories] or that the purchase of the Liberty Property was a voidable fraudulent transfer."[33] Because there is sufficient evidence on which the existence of a purchase-money resulting trust, constructive trust, and fraudulent transfer could reasonably be found at trial,[34] genuine disputes of material fact preclude summary judgment on this basis.

---

[29] 26 U.S.C. § 6322.

[30] *United States v. Craft*, 535 U.S. 274, 278-79 (2002).

[31] *Drye v. United States*, 528 U.S. 49, 58 (1999).

[32] *Id.*

[33] Motion 2, *supra* note 3, at 4.

[34] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment . . . on the lack of proof of a material fact, the judge must ask . . . whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.").

**There is a genuine dispute of material fact regarding the existence of a purchase-money resulting trust.**

A purchase-money resulting trust is an equitable remedy designed to implement what the law assumes to be the intentions of a putative trustor.[35] When a property transfer is made to one person but another person pays the purchase price, a resulting trust arises in favor of the payor.[36] For a resulting trust to exist, the fact that must be proved "is that one party paid the purchase price for property and another party was given legal title."[37] However, a resulting trust does not arise if the payor "manifests an intention that no resulting trust should arise."[38] "[I]t is the intention at the time of the transfer and not at some subsequent time which determines whether a resulting trust arises."[39] Evidence indicating the payor's intention to retain a beneficial interest in property includes:

> (1) that the circumstances are such that the payor would have a reason for taking title in the name of another other than an intention to give him the beneficial interest . . . as, for example, where the payor had reasons for wishing that it should not be known that he was purchasing the property; and (2) that the payor manages the property, collects rents, pays taxes and insurance, pays for repairs and improvements, or otherwise asserts ownership, and the acquiescence by the transferee in such assertion of ownership.[40]

It is undisputed that title to the Liberty Property was transferred to Western Land in 2011, and that the funds for this purchase came, at least in part, from entities affiliated with the Talmages. But whether the Talmages intended at the time of this transfer *not* to retain a

---

[35] *In re Estate of Hock*, 655 P.2d 1111, 1114 (Utah 1982).

[36] *Id.* at 1115 (quoting RESTATEMENT (SECOND) OF TRUSTS § 440 (1959)).

[37] *Estate of Hock*, 655 P.2d at 1115.

[38] RESTATEMENT (SECOND) OF TRUSTS § 441.

[39] *Taylor v. Rupp*, 133 F.3d 1336, 1341 (10th Cir. 1998) (citation and internal quotation marks omitted).

[40] *United States v. Tingey*, 716 F.3d 1295, 1302 (10th Cir. 2013) (citations and internal quotation marks omitted).

beneficial interest in the property is genuinely disputed, as there is sufficient evidence on which it could reasonably be found that the Talmages *did* intend to retain an interest in the property. Specifically, there is sufficient evidence on which it could reasonably be found that the Talmages "had reasons for wishing that it should not be known that [they were] purchasing the property."[41] And there is also sufficient evidence on which it could reasonably be found that the Talmages managed the property, paid for its taxes, repairs, and improvements, and otherwise asserted ownership in the property—all with Western Land's acquiescence.[42] As a result, the Western Entities are not entitled to judgment as a matter of law on this issue.

**There is a genuine dispute of material fact regarding the existence of a constructive trust.**

"A constructive trust is an equitable remedy to prevent unjust enrichment."[43] "Courts recognize a constructive trust as a matter of equity where there has been (1) a wrongful act, (2) unjust enrichment, and (3) specific property that can be traced to the wrongful behavior."[44] To establish a wrongful act, a person must have "received funds by mistake or participated in active or egregious misconduct."[45] "Unjust enrichment occurs when the moving party has an 'equitable interest' in the property it seeks a constructive trust over."[46]

There is sufficient evidence on which it could reasonably be found that the Western Entities committed a wrongful act by helping the Talmages conceal assets from the United States

---

[41] *Tingey*, 716 F.3d at 1302; *see supra* notes 6 and 11-22 and accompanying text.

[42] *See supra* note 41.

[43] *Estate of Hock*, 655 P.2d at 1114.

[44] *Wilcox v. Anchor Wate, Co.*, 2007 UT 39, ¶ 34, 164 P.3d 353 (citation omitted).

[45] *Id.* ¶ 35 (citations omitted).

[46] *Lodges at Bear Hollow Condominium Homeowners Ass'n, Inc. v. Bear Hollow Restoration, LLC*, 344 P.3d 145 (citing *Parks v. Zions First Nat'l Bank*, 673 P.2d 590, 600 (Utah 1983)).

and other creditors.[47] There is sufficient evidence on which it could reasonably be found that these assets were used to purchase and improve the Liberty Property.[47] And there is sufficient evidence on which it could reasonably be found that the Western Entities will be unjustly enriched if they are allowed to retain the Liberty Property.[47] Thus, the Western Entities are not entitled to judgment as a matter of law on this issue.

**There is a genuine dispute of material fact regarding the existence of a fraudulent transfer.**

Section 25-6-5(1) of Utah's Uniform Fraudulent Transfer Act—which applies to the transactions at issue in this case[48]—reads:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (a)   with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (b)   without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor:
>   (i)   was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>   (ii)  intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.[49]

"To determine 'actual intent' under" this statute, "consideration may be given, among other factors, to whether:"

> (a) the transfer or obligation was to an insider; (b) the debtor retained possession or control of the property transferred after the transfer; (c) the transfer or obligation was disclosed or concealed; (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (e) the

---

[47] *See supra* notes 6-22 and accompanying text.

[48] In 2017, the Utah legislature amended and renamed the Uniform Fraudulent Transfer Act as the Uniform Voidable Transactions Act. *See* UTAH CODE § 25-6-101(1). Because the transactions at issue in this case occurred before May 9, 2017, the 2016-version of the act applies. *See id.* § 25-6-406.

[49] UTAH CODE § 25-6-5(1) (2016).

transfer was of substantially all the debtor's assets; (f) the debtor absconded; (g) the debtor removed or concealed assets; (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (j) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[50]

There is sufficient evidence on which it could reasonably be found that the various transactions between the Western Entities, Wadsworth, the Talmages, and their affiliated entities related to the Liberty Property were fraudulent and are voidable under this statute. There is, for example, sufficient evidence of transfers to insiders; of the Talmages' possession and control of the Liberty Property; of the concealment of transactions, obligations, and assets; of the Talmages' corresponding legal problems; of the disproportionate value of consideration exchanged; and of the Talmages' insolvency and subsequent abscondment.[51] Because this evidence is sufficient to create a genuine issue of material fact with respect to the existence of a fraudulent transfer, the Western Entities are not entitled to judgment as a matter of law on this issue.

## ORDER

THEREFORE, IT IS HEREBY ORDERED that the Motions[52] are DENIED.

Signed May 24, 2019.

BY THE COURT:

_David Nuffer_
David Nuffer
United States District Judge

---

[50] *Id.* § 25-6-5(2).

[51] *See* UTAH CODE § 25-6-5; *see also supra* notes 6 and 11-22 and accompanying text.

[52] Docket no. 64, filed December 19, 2016; Docket no. 200, filed November 30, 2018.